(235 P.3d 484)
No. 101,476

NICOLE GOODELL, *Appellee*, v. TYSON FRESH MEATS, *Appellant*.

Opinion filed December 31, 2009.

*Douglas Greenwald* and *Gregory D. Worth*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for the appellant.

*Jeff K. Cooper* and *Gary M. Peterson*, of Topeka, for the appellee.

Before STANDRIDGE, P.J., PIERRON and BUSER, JJ.

PIERRON, J.: Tyson Fresh Meats, Inc. (Tyson), appeals the decision of the Workers Compensation Board (Board) awarding workers compensation benefits to Nicole Goodell after she sustained a work-related injury at Tyson. Tyson argues that because of the Board's split decision, a majority of the Board did not agree upon the nature and extent of Goodell's work disability. Tyson also argues that substantial competent evidence does not support the Board's finding of a work-related injury to Goodell's lower back or the computation of wage loss and task loss, the expert physician's opinion was not based on proper authority, and she did not demonstrate a good-faith effort to find postinjury employment.

In 2005, Goodell worked in processing and cleaning rib bones at Tyson. The parties stipulated that she suffered a work-related accident on October 5, 2005, when a large rolling container of meat tipped over onto her left foot. Tyson authorized treatment for Goodell with Dr. Dale Garrett. Goodell received conservative

treatment including medications, physical therapy, injections, and limited work restrictions. Dr. Garrett referred Goodell to Dr. Stan Bowling, an orthopedic surgeon, for a consultation due to Goodell's continued pain in her left foot. Goodell filed her application for a workers compensation hearing on March 28, 2006, wherein she complained of injuries to her bilateral extremities, calves, low back, and all related systems.

Dr. Bowling ultimately performed tarsal tunnel release surgery on Goodell on October 31, 2006. Dr. Bowling testified that he never provided any treatment to Goodell for lower back pain and that he was only authorized to treat injuries to her left foot and "that's what I focused my care on." In an impairment rating report issued on July 2, 2007, Dr. Bowling opined that Goodell suffered from a permanent partial impairment rating of 10% at the level of her left foot and that she had reached maximum medical improvement on April 20, 2007.

Goodell obtained a medical evaluation from Dr. Sergio Delgado after examinations on June 15, 2006, and September 6, 2007. Dr. Delgado testified that Goodell complained of pain in her left foot and when she transferred weight to her right foot, she developed pain in her right foot, both calves, knees, and then later in her lower back. Dr. Delgado assigned three impairments as a result of Goodell's workplace injury. First, he assigned a 10% impairment to the left lower extremity for the tarsal tunnel condition. Second, he added a 2% impairment based on Goodell's complaints of pain in her right foot. Last, he added another 3% impairment for sacroiliac joint derangement as a result of Goodell's altered gait. Dr. Delgado opined that the 10% left leg impairment converted to a 4% whole impairment and the 2% right leg impairment converted to a 1% whole person impairment; he combined those percentages with the 3% low back impairment for a total of 8% whole person impairment. Dr. Delgado testified that the entire 8% impairment was causally attributable to the workplace injury. He entered permanent restrictions of "avoidance of prolonged standing, sitting, climbing, running or squatting. With not doing these activities on a consecutive basis for more than two hours at a time with periods of rest of up to one hour in between."

After the parties could not agree on a functional impairment rating, the Administrative Law Judge (ALJ) ordered an independent medical examination by Dr. Peter Bieri. Dr. Bieri evaluated Goodell on November 26, 2007, and agreed that Goodell suffered a 10% left foot impairment attributable to the injury at Tyson. However, Dr. Bieri concluded, "While the claimant has subjective complaints involving the low back, hips, and right foot, at the time of this evaluation she fails to meet the criteria for additional permanent impairment directly attributable to the injury in question." Dr. Bieri gave Goodell the following restrictions:

"[C]laimant is precluded from squatting, kneeling, crouching, and crawling . . . . Sustained ambulation and weight-bearing should be limited to no more than 300 feet at a time on level surfaces, with avoidance of climbing or descending ladders of more than three steps. Sustained weight-bearing activities should be limited to no more than two hours at a time, with 30 minutes for postural adjustment."

The ALJ found that Goodell had never been treated for injuries to her back, and the independent medical examiner, Dr. Bieri, found there was insufficient basis for finding a permanent impairment in her back and right foot as the result of her subjective complaints. The ALJ held that the definition of "permanent impairment" excludes body parts which have not been evaluated for the need for medical treatment and implies assessment and treatment have been provided to the body parts affected. The ALJ awarded a 10% left lower extremity impairment as a result of her injuries for a total award of $12,033.42.

Goodell appealed her award to the Board. In a severely fractured opinion, the Board modified the ALJ's award and granted work disability benefits to Goodell based on compensable injuries to both her left foot and her lower back. Two members writing for the majority found the injury to Goodell's back was a direct and natural consequence of her original left foot injury. The Board stated it was not persuaded by the ALJ's explanation that "any award for permanency requires treatment." Combining the 10% impairment for the left foot and the 3% impairment for the lower back, the Board arrived at a 7% impairment to the body as a whole.

The Board also held that because it concluded Goodell had sustained an unscheduled injury to her lower back and sustained per-

manent impairment to her back, she was entitled to benefits based upon an unscheduled impairment under K.S.A. 44-510e(a). The Board found there was no evidence Goodell had not made a good-faith effort to find appropriate postinjury employment and even with her move out of town, there was no evidence that she was attempting to manipulate the workers compensation system. Consequently, Goodell's actual wage loss was used, leaving her with a 78.5% permanent partial general disability and resulting award of $52,528.35 due and owing, followed by permanent partial disability compensation in the amount of $47,471.65 paid at the rate of $346.57 per week until fully paid or until further order from the Director.

Two Board members filed a concurring and dissenting opinion. The two members agreed with the majority's factual findings and its determination that Goodell was entitled to work disability. However, they disagreed with the majority's conclusion that Goodell's functional impairment for the scheduled injury in her left foot should be combined with the functional impairment for her general body injury to her back. The two members agreed that both the left foot injury and the lower back injury occurred as a direct result of the work-related accident. However, the foot injury was a scheduled injury and should be compensated separately. The lower back injury was compensable based on functional impairment for that injury alone and the restrictions resulting from the left foot injury should not be included in determining Goodell's wage and task loss.

One Board member filed a dissenting and concurring opinion in support of the ALJ's limiting Goodell's permanent partial impairment to the left foot but stated that the calculation of the impairment should be modified to reflect the impairment occurring at the level of the foot. This Board member also concurred with the award that injuries involving both a scheduled and nonscheduled injury are to be combined for the purposes of determining the ultimate functional impairment and work disability.

Tyson appeals.

Tyson argues there was not a majority opinion by the Board regarding the nature and extent of Goodell's work disability.

The Board's decision is subject to the parameters of K.S.A. 44-555c(k):

"For purposes of hearing cases, the board may sit together or in panels of two members or more, designated by the chairperson of the board, except that an appeal from a preliminary award entered under K.S.A. 44-534a, and amendments thereto, may be heard by a panel of one member designated by the chairperson. All members of the board shall determine each matter before the board. All decisions, reviews and determinations by the board shall be approved in writing by at least three board members. Whenever the board enters a final order in any proceeding, the board shall make written findings of fact and conclusions of law forming the basis of the board's determination and final order. The findings of fact and conclusions of law of the board shall be made a part of the final order. The board shall mail a copy of the final order of the board to all parties to the proceeding within three days following the issuance of the final order."

Whether the Board entered a majority opinion under K.S.A. 44-555c(k) is a question of statutory interpretation over which we have unlimited review. See *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, Syl. ¶ 1, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

Similar to the scant authority cited by Tyson, our research has discovered only one Kansas case discussing the 3-member majority under K.S.A. 44-555c. In *Lott-Edwards v. Americold Corp.*, 27 Kan. App. 2d 689, 6 P.3d 947 (2000), the insurance company similarly challenged the plurality decisions of the Board. The extent of the decision by this court was as follows:

"All five Board members signed the decision. The Board's lead opinion was signed by two members; a third member concurred except for the holding that the Board had jurisdiction to apportion liability between Travelers and National Union; a fourth member concurred as to the apportionment holding but dissented as to the other holdings. We conclude 'at least three board members' approved each point of law decided and the Board's final order is consistent with the requirements of K.S.A. 1999 Supp. 44-555c(k). The Board functions as a quasi-judicial body, and our interpretation of this statute is consistent with the rule regarding decision-making powers of a collegial court. See *State v. Dowe*, 120 Wis. 2d 192, 194, 352 N.W.2d 660 (1984)." 27 Kan. App. 2d at 692.

Here, two majority Board members held that Goodell had suffered a compensable injury to her lower back. Two minority Board members agreed that Goodell suffered a compensable injury to her lower back. These four members only disagreed with how the

award should be computed. However, the two majority Board members were joined by the one separate minority Board member in finding that both the scheduled lower leg injury and the non-scheduled lower back injury should be combined for purposes of determining Goodell's whole person permanent impairment and work disability. We find the Board entered a decision where at least three members agreed on all the points of law entered by the Board and the Board complied with the mandates of K.S.A. 44-555c(k).

Next, Tyson challenges the Board's assessment of work disability for injuries to Goodell's lower back. Tyson contends the work disability should be limited to a scheduled injury to Goodell's left foot and the award of disability for Goodell's lower back should be vacated in its entirety.

Our review of the Board's decision in a workers compensation appeal is limited to questions of law. *Webber v. Automotive Controls Corp.*, 272 Kan. 700, 704, 35 P.3d 788 (2001). The nature and extent of a workers compensation claimant's disability is a question of fact. *Lott-Edwards*, 27 Kan. App. 2d at 695. An appellate court's review of questions of fact in a workers compensation case is limited to whether the Board's findings of fact are supported by substantial competent evidence, which is a question of law. *Titterington v. Brooke Insurance*, 277 Kan. 888, 894, 89 P.3d 643 (2004). Substantial evidence in workers compensation cases is evidence that possesses something of substance and relevant consequence and carries with it fitness to induce the conclusion that the award is proper, or furnishes a substantial basis of fact from which the issue can be reasonably resolved. The appellate court reviews the evidence in the light most favorable to the prevailing party and does not reweigh the evidence or assess the credibility of the witnesses. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 16-17, 81 P.3d 425 (2003).

Tyson argues the Board's findings of Goodell's lower back injuries are not supported by substantial competent evidence. First, Tyson states Dr. Bowling had no memory of complaints by Goodell of lower back pain and his records did not indicate any such complaints. Consequently, Dr. Bowling did not provide any treatment

to Goodell's lower back. Second, the medical records do not provide evidence that Goodell ever sought treatment for her lower back injuries. Third, the Board-appointed neutral physician, Dr. Bieri, concluded, "While the claimant has subjective complaints involving the low back, hips, and right foot, at the time of this evaluation she fails to meet the criteria for additional permanent impairment directly attributable to the injury in question." Fourth, Dr. Delgado did not find any symptoms of sacroiliac derangement at his initial examination, but granted benefits for sacroiliac derangement over a year later based solely on Goodell's subjective complaints of lower back pain. Last, Tyson maintains the ALJ correctly found that a permanent impairment rating could not be imposed until assessment and treatment of the body part at issue is undertaken.

Goodell was injured on October 5, 2005. In her application for workers compensation hearing, dated March 28, 2006, Goodell complained of injuries to her "[b]ilateral lower extremities, calves, low back, and all related systems." It is clear that as of at least March 28, 2006, Goodell complained of injury or pain in her lower back. However, Dr. Bowling testified that when he last saw her, she did not complain of pain other than in her foot. Goodell, on the other hand, testified that she asked Dr. Bowling to provide treatment on her back. Dr. Bowling agreed that an altered gait would not be out of the ordinary for someone suffering from a tarsal tunnel injury. However, Dr. Bowling testified that he never provided any treatment to Goodell for lower back pain and that he was only authorized to treat injuries to her left foot and that was where he focused his care. Dr. Bowling performed tarsal tunnel release surgery on Goodell on October 31, 2006.

Dr. Delgado examined Goodell on June 15, 2006, and September 6, 2007, at her attorney's request. At the June 2006 examination, Goodell complained of pain in her left foot and that as she transferred weight to her right foot, she developed pain in her right foot, both calves, knees, and then later in her lower back. Dr. Delgado described her lower back as not exhibiting any spasm or guarding, and no evidence of lumbar lordosis. He said Goodell only had subjective complaints related to her lower back. When Dr.

Delgado saw Goodell in September 2007, it was nearly a year post-surgery and she exhibited the same pain levels she complained of in June 2006. Dr. Delgado testified that these symptoms indicated the condition of her back had become chronic and that she should have been given treatment for her lower back. He opined that the delay in treating her altered gait allowed the symptoms in her lower back to become chronic.

In awarding disability to Goodell for injuries to her lower back, the Board stated:

"This majority is not persuaded by the ALJ's explanation that any award for permanency requires treatment. Here, claimant's low back complaints were consistent and longstanding. As was explained by Drs. Delgado and Bowling, the treating physician, it is common for a lower extremity injury to lead to an altered gait. And specifically in this instance, the claimant was experiencing pain while walking and that pain compelled her to alter her gait, transferring a majority of her weight to her opposing extremity which in turn caused unusual stress on her sacroilliac [*sic*]. Even Dr. Bowling conceded he was retained to treat only her left foot and ankle injury, ignoring her other complaints. Ideally claimant should have been provided treatment but for whatever reason she was not. Under these facts and circumstances a majority of the Board finds that claimant's low back complaints are a direct and natural consequence of her October 5, 2005 accident."

Essentially, Tyson asks us to reweigh the evidence and assess the credibility of witnesses. As previously noted, we are precluded from doing so. See *Graham v. Dokter Trucking Group*, 284 Kan. 547, 553-54, 161 P.3d 695 (2007). Instead, we are confined to reviewing this issue using the substantial competent evidence standard. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514, 154 P.3d 494 (2007).

The record reveals substantial support for the majority decision of the Board. Goodell testified she did not have the problems with her back and foot prior to the injury at issue. Doctors agreed that an altered gait, if left untreated, can cause injury to the uninjured foot and the back. The secondary injury rule provides "that when a primary injury under the Workmen's Compensation Act is shown to have arisen out of and in the course of employment every natural consequence that flows from the injury, including a new and distinct injury, is compensable if it is a direct and natural result of a primary injury." *Jackson v. Stevens Well Service*, 208 Kan. 637, 643, 493 P.2d 264 (1972).

Dr. Delgado testified that it was Goodell's pathology and the nature of her original injury that caused him to find that she had a permanent injury to her back. Relying on Dr. Delgado's opinion concerning the injuries to Goodell's lower back, a majority of the Board found Goodell was entitled to work disability. We conclude substantial competent evidence existed to support the Board's findings that the September 2005 work-related accident and the resulting untreated altered gait was the cause for Goodell's 3% permanent impairment to her back.

Next, Tyson argues the Board erroneously relied on Dr. Delgado's permanent partial impairment rating of 3% to the body as a whole for Goodell's lower back condition because the AMA Guides to Evaluation of Permanent Impairment do not include impairment ratings for this condition.

In determining an injured worker's functional impairment, K.S.A. 44-510e(a) provides in relevant part:

"Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein."

An appellate court reviews the trial court's findings of fact to determine if the findings are supported by substantial competent evidence and are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. An appellate court has unlimited review of conclusions of law. *Owen Lumber Co. v. Chartrand,* 283 Kan. 911, 915-16, 157 P.3d 1109 (2007).

Dr. Delgado testified that the first time he examined Goodell, she walked with an altered gait. His opinion was that an "[a]ltered gait can produce symptoms in the opposite leg, knees, hips and frequently in the back just on the basis of the alteration of normal walking." When Dr. Delgado evaluated Goodell following her surgery, she complained of discomfort localized to both sacroiliac joints as compared to generalized discomfort during Dr. Delgado's

first physical evaluation. Dr. Delgado diagnosed Goodell with sacroiliac derangement:

"Which is the most common finding I see in people with altered gaits. It's not the lower back but it's the sacroiliac joint that suffers because normally when you walk there is a rotation that occurs in the leg that does not allow the sacroiliac to be straight. Once you develop a limp, you develop a stiffness of the involved leg and that limits the normal motion of sacroiliac and may develop - - most of the complaints I see of altered gaits would be to the sacroiliac."

Dr. Delgado assigned a 3% whole person impairment for Goodell's sacroiliac derangement. He acknowledged that the AMA Guides did not contain an impairment rating for sacroiliac derangement, but that the AMA Guides assign a 5% whole person impairment for injury to the symphysis pubis. Dr. Delgado testified that the "sacroiliac derangement is not addressed but it can be compared to a symphysis pubis derangement."

The lack of an impairment rating listed in the AMA Guides does not require a finding of zero impairment. K.S.A. 44-510e(a) specifically contemplates the existence of impairment ratings not "contained therein." Dr. Delgado testified that "[t]he Guides are not specific. They are not a bible. They give you parameters in which you can function to arrive at a reasonable impairment rating using comparisons with other ratings that are assigned in the book." Dr. Delgado testified that "[i]f she had not had that injury which was objectively certified through her EMG then I would not even consider assigning impairment to her right lower extremity or her back." We find Dr. Delgado's testimony concerning his computation of Goodell's impairment rating for sacroiliac derangement to be supported by the evidence.

Next, Tyson argues the Board erred in finding Goodell had made a good-faith effort to find appropriate postaccident employment. Requiring an injured worker to put forth a good-faith effort to find appropriate postaccident employment was abolished by the Supreme Court's recent decision of *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 214 P.3d 676 (2009). The *Bergstrom* court eliminated the good-faith effort requisite:

"K.S.A. 44-510e(a) contains no requirement that an injured worker make a good-faith effort to seek postinjury employment to mitigate the employer's liabil-

ity. *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995), *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 320, 944 P.2d 179 (1997), and all subsequent cases that have imposed a good-faith effort requirement on injured workers are disapproved." 289 Kan. 605, Syl. ¶ 3.

The wage loss component of permanent work disability is "the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury." K.S.A. 44-510e(a). Under *Bergstrom*, because Goodell was not working at the time of the regular hearing, the Board did not err in awarding 100% wage loss in calculating her work disability award.

Last, Tyson argues the Board erred in combining Goodell's scheduled left foot injury with the nonscheduled lower back injury to arrive at a single functional impairment and a single work disability award. Tyson contends the correct method for calculating disability benefits in this case would be to apply the scheduled injury to Goodell's left foot, but apply a separate functional impairment work disability to the injury in the lower back. Tyson states there was no evidence applying the wage loss and task loss evidence specifically to the injuries in Goodell's lower back. Tyson argues the permanent restrictions, job task loss, and wage loss evidence were not differentiated between the left foot injury and the lower back injury and, therefore, the Board's award constitutes a windfall to Goodell.

The nature of a work disability dictates the form of the award under the Workers Compensation Act. K.S.A. 44-510c provides compensation for temporary and permanent total disabilities. K.S.A. 44-510d and 44-510e provide compensation for permanent partial disabilities. K.S.A. 44-510d calculates the award based on a schedule of disabilities. If an injury is on the schedule, the amount of compensation in the schedule includes compensation for the complete loss of the member or the partial loss of the member. K.S.A. 44-510d(a)(21). The compensation for a scheduled disability is based on the schedule alone without regard to the claimant's loss in earning power. *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 771, 830 P.2d 41 (1992). For nonscheduled injuries, the award

is calculated under K.S.A. 44-510e. A claimant with a permanent partial general disability pursuant to K.S.A. 44-510e is eligible to receive temporary total disability in addition to the compensation he or she may receive for the permanent partial disability. K.S.A. 44-510c(c); K.S.A. 44-510e.

A scheduled injury includes compensation for the complete loss of the scheduled member and the permanent partial loss of the use of the member. K.S.A. 44-510d(a)(21). With scheduled injuries, compensation is based on the schedule rather than on the individual's loss in earning power. *Stephenson*, 250 Kan. at 771. The Kansas Workers Compensation Handbook § 10.01, p. 10-1 (4th ed. 1998), states three benefits for finding unscheduled injuries, calculated under K.S.A. 44-510e: (1) longer weeks of compensation; (2) no limitation of award to functional impairment; and (3) typically leads to a larger award.

Tyson argues that we should adopt the decision of the two-member concurring and dissenting opinion and find that *Casco*, 283 Kan. 508, requires the scheduled and nonscheduled injuries to be compensated individually. In *Casco*, the claimant suffered a work-related, repetitive-use injury to his left shoulder. Because of the injury and the restrictions associated with his subsequent surgery and treatment, the claimant used his right arm to perform his duties upon his return to work, which included repetitive tying, lifting, and carrying. After several months, the claimant began to experience pain in his right shoulder and was diagnosed with a possible rotator cuff tear in his right shoulder. The Board concluded the claimant suffered a new and separate injury to his right shoulder due to repetitive use and modified the award based on the schedule in K.S.A. 44-510d.

This court reversed and held the Board ignored undisputed medical testimony regarding causation of the claimant's right shoulder injury. The panel concluded the right shoulder injury was a natural and probable consequence of the claimant's left shoulder injury and further held the award should be based on injuries to parallel limbs. See 283 Kan. at 513 (citing *Casco v. Armour Swift-Eckrich*, 34 Kan. App. 2d 670, 682-83, 128 P.3d 401 [2005]).

On petition for review, the employer in *Casco* raised two issues: whether the claimant's right shoulder injury was the natural and probable consequence of his left shoulder injury and whether the claimant should receive compensation for a scheduled injury. With respect to the first issue, the *Casco* court relied upon the Board's factual finding that the claimant was performing repetitive tasks and lifting only with his right arm because of restrictions that limited the use of his left arm. The court determined that even though the Board's factual findings were supported by substantial competent evidence, the Board placed undue emphasis on the claimant's expert's reference to Casco's work activities rather than his opinion linking the causation of Casco's right shoulder injury to his left shoulder injury. Thus, the court held the Board had erroneously concluded the claimant's right shoulder injury was caused by repetitive use. 283 Kan. at 516-18. The *Casco* court applied the secondary injury rule and found the claimant's right shoulder injuries and left shoulder injuries constituted a "single injury" for purposes of calculating the claimant's compensation award. 283 Kan. at 528.

As for the scheduled versus nonscheduled injury issue, the *Casco* court overruled the parallel injury rule established in *Honn v. Elliott*, 132 Kan. 454, 295 P. 719 (1931), which permitted a claimant to "receive compensation based on a permanent partial general disability rather than scheduled injuries if the claimant simultaneously injures parallel members." *Casco*, 283 Kan. at 523, 527. The court then adopted the analytical model established in *Pruter v. Larned State Hospital*, 271 Kan. 865, 26 P.3d 666 (2001), to calculate the claimant's compensation when the claimant suffers a loss of both eyes, both hands, both arms, both feet, both legs, or any combination thereof. *Casco*, 283 Kan. at 525.

*Casco* is distinguishable based on its fact pattern of multiple scheduled injuries. The present case involves scheduled and nonscheduled injuries, and we decline Tyson's invitation to apply *Casco* to limit Goodell to compensation for scheduled injuries. The Board awarded Goodell 10% permanent partial impairment to the left lower extremity and 3% permanent partial impairment to her lower back complaints for a combined total of 7% to the body as

a whole. As we previously stated, these findings are supported by substantial competent evidence, and contrary to Tyson's arguments, this court will not reweigh such evidence to find otherwise.

K.S.A. 44-510e covers compensation for permanent partial general disabilities and thus covers those not included in the 44-510d schedule. K.S.A. 44-510e(a) reads:

"Permanent partial general disability exists when the employee is disabled in a manner which is partial in character and permanent in quality and which is not covered by the schedule in K.S.A. 44-510d and amendments thereto. The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury."

In this instance, K.S.A. 44-510d only covers Goodell's left lower leg injuries. See K.S.A. 44-510d(a)(15). Goodell's lower back injury would qualify under K.S.A. 44-510e. Our courts have held that if the injury is both to a scheduled member and to a nonscheduled portion of the body, compensation should be awarded under K.S.A. 44-510e. See *Bryant v. Excel Corp.*, 239 Kan. 688, 689, 722 P.2d 579 (1986); *Reese v. Gas Engineering & Construction Co.*, 219 Kan. 536, 548 P.2d 746 (1976). Therefore, the Board did not err in granting Goodell an award for her permanent partial general disability.

Affirmed.