NOT DESIGNATED FOR PUBLICATION

No. 115,014

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DELOIS GAYLE SHOEMAKER,
*Appellant*,

v.

STATE OF KANSAS

and

STATE SELF INSURANCE FUND,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed September 22, 2017. Affirmed.

*Roger A. Riedmiller*, of Riedmiller, Andersen & Scott, LLC, of Wichita, for appellant.

*Jeffery R. Brewer*, of Jeffery R. Brewer, P.A., of Wichita, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER, J., and STUTZMAN, S.J.

PER CURIAM: In order to recover permanent partial work disability, a claimant must prove that he or she is "disabled in a manner which is partial in character and permanent in quality" from an injury "arising out of and in the course of employment . . . ." K.S.A. 44-501(a); K.S.A. 44-510e(a). DeLois Gayle Shoemaker appeals an order denying her request for permanent partial work disability, challenging the sufficiency of the evidence. But, the order was supported by substantial competent evidence, including the results of two independent medical evaluations, which showed

1

that she did not suffer a permanent disability. At most, she suffered a temporary aggravation of a preexisting condition. Thus, the order of the Workers Compensation Appeals Board (Board) is affirmed.

FACTUAL AND PROCEDURAL HISTORY

Shoemaker was employed at Larned Juvenile Correctional Facility. In 2007, she filed a workers compensation action alleging several injuries. The first incident occurred when Shoemaker was moving cabinets at work to clean. Another incident arose when Shoemaker had to "clean up ankle deep water for eight hours." In the final incident, a chair fell out from beneath her. Shoemaker alleged that these accidents caused injury to her shoulders, neck, back, and arms and that they permanently worsened her preexisting conditions.

While Shoemaker only complained of these three incidents in her application for a hearing, she testified that there had been quite a number of injurious accidents during her employment at Larned. These included slipping on water (multiple incidents), slipping on humidity, tripping, working in 50 degree temperatures, moving cabinets, and practicing physical restraint techniques. In May 2006, the State paid Shoemaker a $10,000 settlement on several workers compensation claims she had filed based on those prior incidents. Those incidents caused injuries similar to those of which Shoemaker is alleging in the present case. Shoemaker also filed several workers compensation claims against previous employers.

Shoemaker underwent several independent medical examinations. Each of her examining doctors reviewed her medical history and conducted a physical examination. Shoemaker reported a history of chronic pain. Since 2001, she has had numerous medical consultations for, among other things, pain in her back, feet, knees, shoulders, and neck. In 2005, Shoemaker presented to Dr. Lee Dorey with multiple injuries to her spine, knee,

foot, and ring finger. Dr. Dorey concluded that Shoemaker suffered a 13% permanent partial impairment to her whole body. Dr. Dorey gave Shoemaker several work restrictions. A rheumatologist diagnosed Shoemaker with fibromyalgia in 2007, indicating that she had most likely had fibromyalgia for at least three years.

The administrative law judge (ALJ) ordered Shoemaker to receive an independent medical evaluation from Dr. Pat D. Do in August 2007. Shoemaker told Dr. Do that her present pain level was at a 10, on a scale from 0 (no pain) to 10 (excruciating pain). However, Dr. Do did not note any physical distress or discomfort during his physical examination of Shoemaker. Dr. Do concluded that Shoemaker was "suffering from a temporary aggravation of a pre-existing condition." He did not think it would be possible to eliminate all of Shoemaker's reported pain due to her preexisting conditions, but he did think it was possible to "get her back to her baseline of where she was prior to the injury."

The ALJ referred Shoemaker to Dr. Paul S. Stein for another independent medical examination in July 2010. Dr. Stein noted that Shoemaker had mild tenderness along her spine in locations specific to fibromyalgia but not enough tenderness "to make a definitive diagnosis." He concluded that Shoemaker "has had widespread pain essentially throughout the body for many years with multiple episodes of apparent exacerbation." Numerous MRI scans and a CT scan showed "only age and weight related mild degenerative change with no diagnostic findings to explain the symptoms." Dr. Stein thought that Shoemaker's symptoms satisfied the factors for chronic pain syndrome, "which simply means that it is a person complaining of widespread pain without an objective physical basis that could be found." He "believe[d] she believes she has the pain; and, therefore, she has the pain."

When asked if Shoemaker suffered permanent aggravation of her pain from her workplace injuries, Dr. Stein replied: "[W]hat I would have to say is on the purely

subjective basis, she feels that that is the case. I have no objective evidence that that is the case." Dr. Stein assessed Shoemaker under the fourth edition of the American Medical Association Guides (AMA Guides) and concluded that she had 0% permanent impairment of function. Dr. Stein came to this conclusion because the AMA Guides state that "[a]n individual who complains of constant pain but who has no objectively validated limitations in daily activities has no impairment." Chronic pain syndrome is not rated on a percentage basis by the AMA Guides. Shoemaker's attorney asked Dr. Stein to rate Shoemaker's functional impairment without reference to the AMA Guides, considering only Shoemaker's complaints. Dr. Stein replied:

> "[W]hat I would be able to say is that she is severely impaired or believes she is severely impaired. I can't put a percentage on it because I have no framework personally. But I would say if we were comparing it to let's say some of the objective spinal categories in the guides I would have to put it up as high as 30 or 40 percent or more."

Dr. Stein added that, considering only Shoemaker's complaints, she would suffer a 73.6% reduction in her ability to perform work tasks. However, he was unable to apportion his analysis to determine how much, if at all, Shoemaker's most recent workplace injuries contributed to her perceived impairment and task loss. While Dr. Stein could not determine whether Shoemaker's workplace injuries contributed to her condition, he averred that "[Shoemaker] feels that her pain is much worse now based upon those incidents." For that reason, Dr. Stein agreed that the incidents contributed to Shoemaker's diagnosis of chronic pain syndrome. But, he could not say that the incidents caused a permanent aggravation. Rather, he said that "what I would have to say is on the purely subjective basis, [Shoemaker] feels that that is the case. I have no objective evidence that that is the case." Dr. Stein did not place any permanent work restrictions on Shoemaker because he had "no objective evidence of pathology on which to require medical restrictions."

4

Dr. George G. Fluter examined Shoemaker at the request of Shoemaker's attorney in June 2007, May 2009, and March 2010. Dr. Fluter performs about 12 to 15 independent medical evaluations per week, "essentially all" of which are at the request of claimants' attorneys. Dr. Fluter did not think that Shoemaker fit the diagnostic criteria for fibromyalgia but did think that she had a history of chronic persistent pain. He concluded that there was "a causal/contributory relationship between Ms. Shoemaker's current condition and work-related activities." He added that "[a]lthough Ms. Shoemaker has a history of prior injuries affecting the neck and shoulders, these conditions appear to have been exacerbated/aggravated by work activities."

After his 2010 examination, Dr. Fluter calculated an 18% total permanent partial impairment to Shoemaker's body: 8% for mild knee range of motion deficits, 6% for trochanteric bursitis and abnormal gait, and 4% for aggravation of underlying myofascial pain in her spine. He also recommended several restrictions: restrict lifting, carrying, pushing, and pulling to 20 pounds occasionally and 10 pounds frequently, avoid holding the head and neck in awkward or extreme positions, limit overhead activities, and restrict bending, stooping, twisting, squatting, kneeling, crawling, and climbing to an occasional basis. Dr. Fluter's testimony differed from his medical examination report. He testified that he assigned a 19% total permanent partial impairment to Shoemaker—10% for impairment to Shoemaker's spine and 9% for impairment to Shoemaker's shoulders.

In May 2013, Dr. Marc A. Quillen performed a psychological evaluation of Shoemaker at the ALJ's request. Dr. Quillen thought that Shoemaker's history "indicate[d] the presence of a recurrent major depression which ha[d] been assessed as severe in the past, but which [was] presently in the moderate range." Dr. Quillen concluded that while Shoemaker's workplace injuries may have exacerbated her depression, "this exacerbation is not etiologically linked to the work injuries." Dr. Quillen said that "[p]sychologically, it would be to Ms. Shoemaker's benefit to work" and that her psychological condition did not limit her abilities in that respect.

5

The ALJ found that Shoemaker "met her burden to prove that she met with personal injury by accident arising out of her employment with Respondent . . . ." But, the ALJ held that Shoemaker failed to "meet her burden to prove that she sustained any permanent impairment or disability" as a result of her accidents. The ALJ relied on the opinions of Dr. Stein and Dr. Quillen. The ALJ believed that "Dr. Stein and Dr. Quillen offer a more credible opinion than Dr. Fluter, an admitted Claimant's expert, who was hired by Claimant to render his opinion." The ALJ also noted that Dr. Do's opinion supported those of Dr. Stein and Dr. Quillen. The ALJ awarded Shoemaker medical expenses but did not award her anything for temporary total disability or permanent partial disability. Shoemaker filed a request for review with the Board. The Board found no error in the ALJ's decision.

Shoemaker filed a petition for judicial review.

ANALYSIS

*There was substantial evidence to support the Board's finding.*

Shoemaker's first argument is that there is not substantial evidence to support the Board's finding that she did *not* sustain a permanent impairment of function. She argues that the Board placed too much weight on Dr. Stein's testimony that Shoemaker had 0% impairment under the AMA Guides. She asserts that the Board failed to consider Dr. Stein's opinion that her functional impairment, without reference to the AMA Guides, is between 30 and 40%.

An appellate court reviews a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial evidence. See K.S.A. 2016 Supp. 77-621(c)(7). "Substantial evidence" refers to evidence possessing something of substance and relevant

6

consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

Compensation for permanent partial general disabilities is discussed in K.S.A. 44-510e, which provides:

> "The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. In any event, the extent of permanent partial general disability shall not be less than the percentage of functional impairment. Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, *if the impairment is contained therein*." (Emphasis added.)

Shoemaker's argument focuses on the language "if the impairment is contained therein." The AMA Guides do not provide a way to evaluate chronic pain syndrome on a percentage basis. So, Shoemaker argues that "Dr. Stein's opinion as to functional impairment being between 30% and 40%" should have been considered by the Board. She cites *Goodell v. Tyson Fresh Meats*, 43 Kan. App. 2d 717, 235 P.3d 484 (2009), in support. So we will examine the facts and holding of *Goodell*.

In *Goodell*, Nicole Goodell sustained an injury to her left foot while she was working at Tyson Fresh Meats, Inc. Goodell alleged that the left foot injury led to injury in her right foot and lower back. Dr. Stan Bowling treated Goodell's left foot and concluded that she suffered a permanent partial impairment rating of 10% in the left foot.

He did not provide treatment for back pain. Dr. Sergio Delgado also evaluated Goodell and concluded that she suffered a 10% impairment in the left foot. Dr. Delgado also found a 2% impairment in Goodell's right foot and a 3% impairment in Goodell's lower back as a result of her altered gait. Dr. Peter Bieri also found a 10% impairment in Goodell's left foot. However, he concluded that "'[w]hile the claimant has subjective complaints involving the low back, hips, and right foot, at the time of this evaluation she fails to meet the criteria for additional permanent impairment directly attributable to the injury in question.'" 43 Kan. App. 2d at 720.

The ALJ awarded a 10% left lower extremity impairment to Goodell. Goodell appealed to the Board, which modified her award to include an award for a 3% impairment to Goodell's lower back, as recommended by Dr. Delgado. A majority of Board members felt that Goodell's lower back injury was a direct and natural consequence of her original left foot injury. The Board relied on statements from Dr. Delgado and Dr. Bowling that "'it is common for a lower extremity injury to lead to an altered gait'" which in turn could cause back injury. 43 Kan. App. 2d at 725. Tyson appealed.

One of Tyson's arguments on appeal was that "the Board erroneously relied on Dr. Delgado's permanent partial impairment rating of 3% to the body as a whole for Goodell's lower back condition because the AMA Guides to Evaluation of Permanent Impairment do not include impairment ratings for this condition." 43 Kan. App. 2d at 726. The Court of Appeals rejected this argument, holding that "[t]he lack of an impairment rating listed in the AMA Guides does not require a finding of zero impairment. K.S.A. 44-510e(a) specifically contemplates the existence of impairment ratings not 'contained therein.'" 43 Kan. App. 2d at 727. The court found that Dr. Delgado's opinion was supported by the evidence because he testified that he would not have assigned impairment to Goodell's lower back or right foot "'[i]f she had not had that injury which was objectively certified through her EMG . . . .'" 43 Kan. App. 2d at 727.

8

Shoemaker relies on *Goodell* for the proposition that her chronic pain syndrome can create functional impairment even though it is not rated by the AMA Guides. Shoemaker asserts that "her case is almost identical in appropriate factual analysis to the *Goodell* case" and that the Board should have found "Dr. Stein's opinion as to functional impairment being between 30% and 40%" as persuasive.

There are several significant factual differences between the present case and *Goodell*. The *Goodell* court found Dr. Delgado's opinion persuasive because it was supported by objective evidence that Goodell's left foot had been injured, and because multiple doctors testified that an injury to the foot (which may cause a change in gait) could lead to injury in the lower back. 43 Kan. App. 2d at 725, 727. Here, Dr. Stein was very clear that there is *no* objective evidence of injury. Another distinction is that Goodell's back issues were directly attributable to her workplace foot injury. Even if the Board were to accept Dr. Stein's response to a hypothetical situation in which he assigned Shoemaker a 30 to 40% functional impairment rating, there is no evidence that the functional impairment was directly attributable to Shoemaker's workplace injuries. Dr. Stein could not opine as to whether Shoemaker's workplace injuries contributed to her condition, and he also could not say that the incidents caused a permanent aggravation of her condition. Finally, Dr. Stein was not truly assigning a functional impairment rating of 30 to 40%. Rather, he was responding to a hypothetical in which he was asked to rate Shoemaker's impairment based on her own subjective complaints. He thought that Shoemaker thought she was suffering from 30 to 40% impairment. This is different than Dr. Delgado's opinion because Dr. Delgado's opinion was based on the totality of the results of his independent medical evaluation.

The Board did consider Dr. Stein's testimony that Shoemaker believed she suffered 30 to 40% impairment. The Board quoted this portion of Dr. Stein's testimony in its order. The Board found that Dr. Stein's medical opinion, based on all of the evidence and supported by the opinions of Drs. Do and Quillen, deserved more weight than Dr.

9

Stein's response to a hypothetical question. It was reasonable for the Board to make this conclusion. This court cannot reweigh the evidence. K.S.A. 2016 Supp. 77-621(d). After our review of the record as a whole, we conclude that the Board's factual findings were supported by substantial evidence.

*Shoemaker is not entitled to an award for work disability if she has not sustained permanent impairment of function.*

Shoemaker also argues that she is entitled to an award for work disability even if she does not prove permanent impairment of function. Shoemaker's argument is based on recent amendments to Kansas' workers compensation statutes. The most recent version of the statute is clear that an employee's ability to recover for permanent partial general disability is dependent on the employee's level of functional impairment. K.S.A. 2016 Supp. 44-510e(a)(2)(B) ("The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence . . . ."). However, the law in effect on the date of the injury controls in workers compensation cases. *Bryant v. Midwest Staff Solutions, Inc.*, 292 Kan. 585, 588-89, 257 P.3d 255 (2011). The parties stipulated that Shoemaker's injuries occurred in 2007 and 2008. At that time, Shoemaker argues that the statute did not have a "pre-requisite, requirement, limitation, or statement about Claimant being required to prove functional impairment before the Claimant is entitled to permanent partial disability for work disability."

This court exercises unlimited review over issues of statutory interpretation. *Bryant*, 292 Kan. at 587.

Shoemaker's argument seems to be that she is entitled to permanent partial work disability even though she has not proven functional impairment. Shoemaker's focus on functional impairment ignores the other requirements of the statute. At the time of

Shoemaker's injuries, K.S.A. 44-510e(a) provided: "Permanent partial general disability exists when the employee is disabled in a manner which is partial in character and permanent in quality . . . ." Thus, regardless of whether Shoemaker was required to prove functional impairment, she still had the burden of proving that she was permanently disabled.

The Board found that Shoemaker failed to prove permanent impairment. The Board's decision is supported by the opinion of Dr. Stein, who could not conclusively determine whether Shoemaker's workplace injuries caused a permanent aggravation of her chronic pain. Dr. Do also found that Shoemaker was suffering only from a temporary, not a permanent, aggravation of a preexisting condition. Because Shoemaker failed to prove that she suffered a permanent disability arising out of and in the course of employment, the Board's decision was supported by substantial evidence.

Affirmed.

11